## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-81283-CIV-LENARD/WHITE
(CRIMINAL CASE NO. 01-8084-CR-LENARD)

**ELROY A. PHILLIPS,**

      Movant,

v.

**UNITED STATES OF AMERICA**,

      Respondent.

_____/

### ORDER DENYING MOTIONS FOR RELEASE OF MOVANT ON HIS OWN RECOGNIZANCE (D.E. 267, 292) AND GRANTING MOTION FOR STATUS CONFERENCE (D.E. 303)

**THIS CAUSE** is before the Court on Movant Elroy Phillips' Motion for Release of Movant on His Own Recognizance ("Motion for Release," Case No. 08-21283-CV, D.E. 267), Amended Motion for Release of Movant on His Own Recognizance ("Amended Motion for Release," Case No. 08-21283-CV, D.E. 292), and Motion for Status Conference (Case No. 08-21283-CV, D.E. 303). Also before the Court are the Parties' Amended Joint Motion to Vacate Defendant's Convictions on Counts 1, 9, 14, and 17 Pursuant to 28 U.S.C. § 2255 and to Dismiss With Prejudice Counts 1, 9, 14, and 17 and Parties' Amended Stipulated Motion to Dismiss With Prejudice the Remainder of 28 U.S.C. § 2255 Proceeding ("Joint Motion," Case No. 01-8084-CR, D.E. 487; Case No. 08-21283-CV, D.E. 274), the Parties' Joint Memorandum of Law in Support of Motion to Vacate Movant's Convictions

on Counts 1, 9, 14, and 17 Pursuant to 28 U.S.C. § 2255 ("Joint Memorandum," Case No. 01-8084-CR, D.E. 490; Case No. 08-21283-CV, D.E. 281), the Factual Proffer in Support of Memorandum of Law ("Factual Proffer," Case No. 01-8084-CR, D.E. 490-1; Case No. 08-21283-CV, D.E. 281-1), and exhibits filed in support of their Joint Memorandum and Factual Proffer (see Case No. 08-21283-CV, D.E. 280, 287).  The Parties also provided the Court with courtesy copies of documents that support the Joint Memorandum and Factual Proffer.  Upon review of the Motion for Release, Amended Motion for Release, Motion for Status Conference, Joint Motion, Joint Memorandum, Factual Proffer, exhibits and courtesy copies filed in support of the Joint Memorandum and Factual Proffer, and the record in the civil and criminal cases, the Court finds as follows.

Phillips seeks release from incarceration pending the Court's decision on the Joint Motion to Vacate.  "A prisoner seeking release pending habeas corpus can be granted bail under two sets of circumstances: first, he must demonstrate a likelihood of success on the merits of a substantial constitutional claim; second, extraordinary and exceptional circumstances must exist which make the grant of bail necessary to preserve the effectiveness of the habeas corpus relief sought."  Gomez v. United States, 899 F.2d 1124, 1125 (11th Cir. 1990) (citing Calley v. Callaway, 496 F.2d 701, 702 (5th Cir. 1974)).[1]  Because Phillips has not demonstrated a likelihood of success on the merits of a substantial constitutional claim,

---

[1]      In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

2

and because extraordinary and exceptional circumstances do not exist which make the grant of bail necessary to preserve the effectiveness of the habeas corpus relief sought, Phillips is not entitled to release pending this Court's ruling on the Joint Motion to Vacate.

In their Joint Motion, the Parties requested that the Court vacate Phillips' convictions as to Counts 1, 9, 14, and 17 pursuant to 28 U.S.C. § 2255.  (Joint Motion 1-2.)  To "vacate and set the judgment aside" under 28 U.S.C. § 2255, the Court first must make "findings of fact and conclusions of law."  28 U.S.C. § 2255(b).  Because the Parties' Joint Motion did not provide the Court with a basis to vacate and set the judgment aside under 28 U.S.C. § 2255, the Court ordered the Parties to file a joint memorandum of law and a factual proffer in support of their Joint Motion.[2]  In their Joint Memorandum, the Parties presented claims of alleged <u>Brady</u> and <u>Giglio</u> violations, which the Court addresses below.

## I.   Alleged Suppression of **<u>Brady</u>** Material

In <u>Brady v. Maryland</u>, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad

---

[2]      The Court also directed the Government to submit additional information in support of the Parties' Joint Motion, (<u>see</u> Orders, D.E. 293, 301), and the Government filed sealed, <u>ex parte</u> responses to the Court's Orders, which the Court has reviewed <u>in camera</u>.  The Court does not refer to the contents of the Government's responses in this Order; however, the Court notes that the contents of the Government's responses do not change the analyses of the issues in this Order.

faith of the prosecution." 373 U.S. 83, 87 (1963).[3] "'Three elements establish a <u>Brady</u> violation: (1) the evidence must be favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.'" <u>United States v. Naranjo</u>, 634 F.3d 1198, 1212 (11th Cir. 2011) (quoting <u>Stephens v. Hall</u>, 407 F.3d 1195, 1203 (11th Cir. 2005)); <u>see also</u> <u>United States v. Spagnoulo</u>, 960 F.2d 990, 994 (11th Cir. 1992) (including as a fourth prong in the <u>Brady</u> analysis "that the defendant [did] not possess the evidence nor could he [have] obtain[ed] it himself with any reasonable diligence"). "Evidence would be 'material' if it is reasonably probable that a different outcome would have resulted if the government had disclosed the evidence." <u>Ferguson v. Sec'y, Dep't of Corr.</u>, 580 F.3d 1183, 1205 (11th Cir. 2009) (citing <u>Lamarca v. Sec'y, Dep't of Corr.</u>, 568 F.3d 929, 941 (11th Cir. 2009)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 1205-06 (quoting <u>Lamarca</u>, 568 F.3d at 941) (quotation marks omitted). "Inadmissible evidence may be material if the evidence would have led to admissible evidence." <u>Wright v. Hopper</u>, 169 F.3d 695, 703 (11th Cir. 1999) (citing <u>Spaziano v. Singletary</u>, 36 F.3d 1028, 1044 (11th Cir. 1994)); <u>Breedlove v. Moore</u>, 279 F.3d 952, 964 (11th Cir. 2002) (noting that "[i]nadmissible evidence could only rarely meet [<u>Brady's</u> materiality] standard"); <u>see also</u> <u>Bradley v. Nagle</u>,

---

[3]     The Supreme Court later held that "[a] <u>Brady</u> claim arises when the prosecutors fail to disclose evidence material to the prosecution, even when 'there has been no request by the accused.'" <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999) (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976)).

212 F.3d 559, 567 (11th Cir. 2000) (in a § 2254 case, finding that because "[e]ach item of evidence was in fact inadmissible at trial[,] . . . in order to find that actual prejudice occurred – that our confidence in the outcome of the trial has been undermined – we must find that the evidence in question, although inadmissible, would have led the defense to some admissible material exculpatory evidence"). Finally, "[m]ateriality is determined by asking whether the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict." Allen v. Sec'y, Dep't of Corr., 611 F.3d 740, 746 (11th Cir. 2010) (citing, inter alia, Kyles v. Whitley, 514 U.S. 419, 434, 436-37 & n.10 (1995)).

### A.      Alleged Pretrial Criminal Conduct by Officer Michael Ghent

In their Joint Memorandum, the Parties argue that former undercover West Palm Beach Police Department ("WPBPD") officer Michael Ghent's "involvement in the use and distribution of controlled substances was impeaching and material as defined by Brady." (Joint Memorandum 15.) The Factual Proffer contains allegations that Ghent was engaged in various criminal activities, including the use, distribution, and sale of narcotics, during the time of the investigation of this criminal case through the time of Phillips' trial. (See Factual Proffer ¶¶ 4, 5, 51, 54, 58, 59.) These allegations regarding Ghent's use, distribution, and/or sale of narcotics were made by the following individuals: (1) workers employed by the "Relax With Us" massage parlor in West Palm Beach; (2) Gnita Chappelle-Simmons ("Chappelle"), a Confidential Informant ("CI"); and (3) "L.W.," the mother of Ghent's second child. (See id.) There is no indication in the record that Ghent was ever charged with

5

or convicted of any drug offense, that Ghent was ever charged with or convicted of any criminal conduct during the time of Phillips' investigation and trial, or that Ghent ever admitted to distributing or selling narcotics.[4]   Although the Parties argue that these allegations of criminal conduct against a testifying officer that allegedly occurred during the investigation of Phillips and his trial constitute <u>Brady</u> material that should have been disclosed to the defense, the Parties fail to explain how allegations of an officer's criminal conduct from third parties is exculpatory or impeaching evidence (or could have led to the discovery of exculpatory or impeaching evidence), and how these allegations can be considered "material."  Furthermore, the Parties fail to explain how these allegations can be imputed to the Government.

The Parties cite to <u>Arnold v. Secretary, Department of Corrections</u>, 595 F.3d 1324 (11th Cir. 2010), for the proposition that "where a police officer who was a lead investigator and key trial witness was contemporaneously involved in criminal activity but did not disclose his involvement in those crimes, the 'prosecution team' had committed a <u>Brady</u> violation, even if none of the prosecutors knew about the <u>Brady</u> material."  (Joint Memorandum 14-15.)  However, the facts in <u>Arnold</u> are materially different from the facts in this case.  Unlike this case, in <u>Arnold</u>, the testifying police officer was charged, pled

---

[4]     In his deposition, Ghent admitted to using marijuana while in college, but did not admit to any other drug use.  Furthermore, the Parties noted that "Ghent continues to deny all of the criminal activity discussed [in the Joint Memorandum], despite his entry into a Non-Prosecution Agreement."  (Joint Memorandum 15 n.17.)  Ghent entered into a deferred prosecution agreement with the Palm Beach County State Attorney's Office in 2007 for activities occurring after Phillips' trial.  <u>See</u> <u>infra</u> Part I.B.

guilty, and admitted to being involved in criminal activity that occurred during the officer's investigation of the defendant and during the defendant's trial.  Arnold v. McNeil, 622 F. Supp.2d 1294, 1303 (M.D. Fla. 2009).[5]

In that case, the defendant, Darryl Arnold, allegedly sold crack cocaine on May 27, 1998, was arrested on June 17, 1998, was charged with one count of the unlawful sale or delivery of cocaine on July 7, 1998, and was found guilty of the sale and delivery of cocaine on October 9, 1998.  Id. at 1298-99, 1304 n.5.  Detective Aric Sinclair was the officer who participated in the investigation of Arnold and identified Arnold at trial as the perpetrator of the drug deal for which Arnold was convicted.  Id. at 1305 n.6.

Nearly a year after Arnold's trial, on September 9, 1999, the federal government began investigating Sinclair's criminal activities during the time of his investigation of the Arnold case.  On September 4, 2001, Sinclair pled guilty to conspiracy to commit a civil rights violation leading to the murder of Sami Safar, conspiracy to distribute cocaine, and conspiracy to obstruct justice.  Id. at 1302.  The Arnold Court set forth the factual proffer in Sinclair's September 4, 2001 plea agreement, wherein Sinclair admitted to the extensive factual basis for each of his crimes.  See id. at 1302-06.  The Court summarized Sinclair's criminal activity as follows:

Sinclair was admittedly involved in criminal activity, including facilitating

_____

[5]       The Eleventh Circuit issued a per curiam opinion, in which it stated that it "adopt[ed] the thorough and well-reasoned opinion of the district court."  Arnold v. Sec'y, Dep't of Corr., 595 F.3d 1324, 1324 (11th Cir. 2010).  Accordingly, the Court cites to the district court's opinion.

murder, robbery and dealing in cocaine during the same time frame as Arnold's arrest and trial. This criminal activity included using his authority as a police officer to coerce drug dealers into doing his criminal bidding. Arnold was arrested on June 17, 1998, after an undercover drug investigation on May 27, 1998, where Sinclair was a primary detective on the case and the only person to identify Arnold at the scene as the seller of the cocaine. In the months preceding Arnold's arrest, Sinclair used his position as a police officer to facilitate the theft of drugs and money from numerous individuals and on May 15, 1998, just days before the May 27, 1998 drug buy that resulted in Arnold's arrest, Sinclair, who was performing off-duty security work at a bank, orchestrated and participated in the robbery of Hassam Tahhan.

Moreover, just after the arrest of Arnold, but before Arnold's October 1998 trial, [Jacksonville Sheriff's Office] Officer Waldon approached Sinclair about assisting him in another robbery of another customer of the bank (Sami Safar). Sinclair provided Waldon with a description of Safar's vehicle and told Waldon that Safar usually withdrew large sums of money on Fridays, but refused to assist him in another robbery because the heat was on from the first robbery.

On July 3, 1998, Waldon and others, using the information provided by Sinclair, robbed and murdered Safar. Within a week, a Jacksonville Sheriff's Office homicide detective interviewed Sinclair. Sinclair misled the detective to protect himself and Waldon and to help cover up his crimes. All this occurred before Sinclair came into state court on October 8, 1998, and testified against Arnold at his trial.

Id. at 1310-11 (emphasis added) (internal quotations and citations omitted). The Arnold

Court concluded that the Government had violated Brady, finding that "evidence of Sinclair's

criminality would have been favorable to the defense at least for impeachment purposes,"

because Sinclair "was admittedly involved in criminal activity . . . during the same time

frame as Arnold's arrest and trial." Id. at 1310.

In contrast, here, Ghent has never been charged with, convicted of, or admitted to any

criminal activity that took place during his investigation of Phillips in 2001 or during the time

8

of Phillips' trial in 2002.  Although the Parties have presented allegations of Ghent's use, distribution, and/or sale of drugs from massage parlor workers, Chappelle, and Ghent's ex-girlfriend, Ghent has never been charged with or convicted of any drug-related crime, and aside from his admitted marijuana use in college (which predated the investigation in this case), Ghent has never admitted to using, distributing, or selling controlled substances.  The Parties in this case have not explained to the Court on what basis Ghent's uncharged, alleged, criminal activity would have been admissible at Phillips' trial in 2002 or how these third party allegations of Ghent's criminal conduct would have led to the discovery of admissible evidence, and "[a] court cannot speculate as to what evidence the defense might have found if the information had been disclosed."  Wright, 169 F.3d at 703 (citing Wood v. Bartholomew, 516 U.S. 1, 116 S. Ct. 7, 11 (1995) (per curiam)).  If the evidence of Ghent's uncharged, alleged, criminal activity would not have been admissible at trial and would not have led to the discovery of admissible evidence, then it cannot be considered "material" under Brady.  See id. (citing Spaziano, 36 F.3d at 1044); see also Wood, 516 U.S. at 5-6 (finding that the prosecution's failure to disclose pretrial polygraph results of two government witnesses was not a Brady violation because the polygraph results would have been inadmissible under Washington state evidence rules, and as such, the defendant could not have mentioned the results at trial, either during argument or when questioning witnesses); Gilliam v. Sec'y, Dep't of Corr., 480 F.3d 1027, 1032-33 (11th Cir. 2007) (per curiam) (in a § 2254 case, finding that the inadmissibility into evidence of a police report that

9

indicated that the rape victim had a history of prostitution supported the state court's conclusions that the report was not material under <u>Brady</u>); <u>Bradley</u>, 212 F.3d at 566-67 (in a § 2254 case, finding no <u>Brady</u> violation because undisclosed police notes and a note received by the police would be inadmissible hearsay at trial and the defendant presented "only speculation that he would have uncovered any admissible evidence from these three hearsay leads").

Accordingly, although the Parties rely on <u>Arnold</u>, this case appears more analogous to <u>Ferguson v. Secretary, Department of Corrections</u>, 580 F.3d 1183 (11th Cir. 2009) and <u>Breedlove v. Moore</u>, 279 F.3d 952 (11th Cir. 2000).[6]  In <u>Ferguson</u>, the defendant, John Ferguson, argued that the prosecution violated <u>Brady</u> by failing to disclose evidence that three of its witnesses, detectives Robert Derringer, Charles Zatrepalek, and Michael MacDonald, were under investigation for drug trafficking, conspiracy, theft, and civil rights violations at the time of Ferguson's trial.  <u>Ferguson</u>, 580 F.3d at 1204-05.  The conduct by these three detectives "ultimately led to a 40-count indictment and multiple convictions for various individuals, including Derringer." <u>Id.</u> at 1205 n.29 (citation omitted).  The Eleventh Circuit found that because "the detectives had not been charged at the time of Ferguson's trials," under Florida state evidence rules, evidence of the detectives' illegal activities "would have been admissible only if the investigations were related to the cases against Ferguson and

---

[6]     The Court notes that <u>Arnold</u>, <u>Ferguson</u>, and <u>Breedlove</u> involved a state prisoner's petition for a writ of habeas corpus under 28 U.S.C. § 2254, and the courts in these cases all made findings based on Florida's evidence rules.

were not too remote in time from his trials." Id. at 1206.  The Eleventh Circuit determined that because "Florida courts would have treated such evidence as inadmissible, it is immaterial for Brady purposes," and the Eleventh Circuit concluded that Ferguson failed to state a valid Brady claim.[7]  Id. at 1207.  Similarly, in Breedlove, which involved the "alleged suppression of evidence regarding illegal activities by many of the same detectives who testified at Ferguson's trials, Ferguson, 580 F.3d at 1206, the Eleventh Circuit stated that "evidence of unrelated illegal activity by a police officer testifying for the state would likely not have been admissible under Florida's law of evidence, and thus immaterial for Brady purposes," Breedlove, 279 F.3d at 964 (citing Delap v. Dugger, 890 F.2d 285, 298 (11th Cir. 1989)).[89]

---

[7]    The Eleventh Circuit noted that the district court, in addition to finding that the evidence was not material, found that the "State did not have possession of the impeachment evidence for the purposes of a Brady violation since it had no actual knowledge of the evidence and the prosecution's duty to inquire into such evidence would have been trumped by the detectives' Fifth Amendment rights" and also found that "the results of the proceedings would not have changed if the impeachment evidence had been presented."  Ferguson, 580 F.3d at 1205.  However, "[b]ecause [the Eleventh Circuit found] that the evidence was not material for the purposes of Brady, [the Eleventh Circuit did] not address the other prongs."  Id. at 1206.

[8]    The Eleventh Circuit noted that Breedlove "involved a post-AEDPA inquiry into objective unreasonableness," whereas Ferguson involved a "de novo review."  Ferguson, 580 F.3d at 1206 (citing Breedlove, 279 F.3d at 963).

[9]    These post-trial allegations of Ghent's pretrial criminal conduct are also similar to those considered by the Sixth Circuit in United States v. Jones, 399 F.3d 640 (6th Cir. 2005).  In Jones, on the defendant's direct appeal, the Sixth Circuit noted that state police officers Terry Spence and Kerry Nelson had taken actions against the defendant that appeared to be racially motivated.  Jones, 399 F.3d at 642-43.  The Sixth Circuit reversed the defendant's conviction and sentence and remanded the case to the district court to compel discovery on defendant's selective prosecution claim.  Id. at 643.  On remand, the district court allowed the defendant and the government to examine the police department's practices, and the city also conducted an internal

Furthermore, the Parties have failed to show how these third party allegations of Ghent's conduct can be imputed to the Government.  The Supreme Court has stated that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  Kyles, 514 U.S. at 437.  "Kyles does not, however, further define what exactly is meant by 'acting on the government's behalf.'"  Moon v. Head, 285 F.3d 1301, 1309 (11th Cir. 2002).  A claimant must show that the favorable evidence was possessed by "a district's prosecution team, which

---

investigation into the Murfreesboro Police Department.  Id. at 643-44.  The internal investigation revealed the following:

> These investigations determined that the then-head of the vice unit, Officer Mickey McCullough, as well as Spence, had engaged in widespread misconduct that was not racially motivated.  With regard to McCullough, such conduct included, among other things: drinking while on duty; use of seized drug funds for personal use; use of seized property for personal use; giving false statements in an internal investigation; and threatening to destroy departmental documents sought in a civil suit against the City.  As to Spence, such misconduct included, among other things: inappropriate handling of seized money and drug evidence; inappropriate use of City property for personal use; lying to a judge; cheating on an employment test; and failure to report numerous professional violations by fellow officers, including the planting of drugs on the property of a criminal suspect, and the operation of police vehicles while intoxicated.

Id. at 647.  The government did not dispute these findings.  Id.  After the close of discovery, the defendant moved for a new trial arguing that the government failed to disclose newly discovered exculpatory evidence impeaching the credibility of testifying officers under Brady.  Id. at 644.  The district court denied the defendant's motion for a new trial and rejected the Brady and Giglio arguments, holding that "most of the documents sought by Jones were created after trial; accordingly, they could not have been improperly suppressed under Brady."  Id.  The Sixth Circuit affirmed the district court's findings, stating that "the district court correctly concluded that the vast majority of the evidence of departmental misconduct was discovered by the City after the case was remanded to the district court for discovery relating to selective prosecution. As such evidence did not exist at the time of trial, it was not Brady material."  Id. at 647.

12

includes both investigative and prosecutorial personnel.'" <u>United States v. Meros</u>, 866 F.2d 1304, 1309 (11th Cir. 1989) (holding that a prosecutor in the Middle District of Florida did not "possess" favorable information known by prosecutors in the Northern District of Georgia and the Eastern District of Pennsylvania). The Eleventh Circuit has "further defined a 'prosecution team' as 'the prosecutor or anyone over whom he has authority.'" <u>Moon</u>, 285 F.3d at 1309 (quoting <u>Meros</u>, 866 F.2d at 1309). There is "no per se rule to determine whether information possessed by one government entity should be imputed to another, but rather, [what is] required [is] 'a case-by-case analysis of the extent of interaction and cooperation between the two governments.'" <u>Id.</u> (quoting <u>United States v. Antone</u>, 603 F.2d 566, 570 (5th Cir. 1979)); <u>see also</u> <u>Trepal v. Sec'y, Fla. Dep't of Corr.</u>, 684 F.3d 1088, 1110 n.24 (11th Cir. 2012) (noting that "[t]here is a substantial issue as to whether FBI Agent Martz's knowing false testimony can be imputed to the Florida State Attorney who prosecuted the Trepal case");[10] <u>United States v. Avellino</u>, 136 F.3d 249, 255 (2d Cir. 1998) (stating that "[k]nowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor" (quoted in <u>Moon</u>, 285 F.3d at 1310)).

_____

[10]    The Eleventh Circuit in <u>Trepal</u> reiterated the findings by the <u>Moon</u> Court that "(1) a prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf, including law enforcement officers, and (2) thus knowledge possessed by any member of the 'prosecution team' is imputed to the prosecutor, but (3) whether knowledge held by members of one governmental entity can be imputed to a prosecutor working for a different governmental entity is determined using 'a case-by-case analysis of the extent of interaction and cooperation between the two governments.'" <u>Trepal</u>, 684 F.3d at 1110 n.24 (quoting <u>Moon</u>, 285 F.3d at 1309-10).

13

The Parties have not set forth any analysis regarding how third-party allegations of a testifying officer's alleged criminal conduct, discovered through a post-trial investigation, can be imputed to the Government.  The Government has repeatedly stated that the Assistant United States Attorney ("AUSA") who handled Phillips' prosecution did not have any knowledge of these allegations or of Ghent's alleged criminal conduct before or during Phillips' trial.  (See Joint Memorandum 1, 10, 11, 15, 17, 25-26, 28.)  Furthermore, even assuming that Ghent was engaged in criminal conduct during his investigation of Phillips and during Phillips' trial, the Parties have not set forth any analysis as to whether Ghent's knowledge of his own criminal conduct can be imputed to the prosecution.  See, e.g., United States v. Espinosa-Hernandez, 918 F.2d 911, 914 n.5 (11th Cir. 1990) ("express[ing] no opinion as to whether [Customs Service Agent] Urso's knowledge of his own misconduct can be attributed to the United States Attorney").  During the relevant time period, Ghent was a member of the West Palm Beach Police Department, and Phillips was prosecuted by the United States, a different governmental entity.  The Parties have not alleged that Ghent was part of a joint investigation; in fact, the Parties have stated that Ghent "began an independent investigation at 625 8th Street, Apartment 2, beginning in January 2011, following the [federal Drug Enforcement Agency] MET Team's departure from West Palm Beach." (Joint Memorandum 2.)

Accordingly, at this stage in the proceedings, because the Parties have failed to show how third party, post-trial allegations of Ghent's criminal conduct occurring before and

during Phillips' trial would be material evidence under <u>Brady</u>, or how these allegations can be imputed to the Government, the Court finds that Phillips has failed to show "a likelihood of success on the merits" on this <u>Brady</u> claim. <u>Gomez</u>, 899 F.2d at 1125 (citing <u>Calley</u>, 496 F.2d at 702).

### B.     Alleged Post-Trial Criminal Conduct by Ghent

In addition, the Factual Proffer contains allegations related to Ghent's criminal conduct following Phillips' trial. In January 2007, the West Palm Beach Police Department and the Federal Bureau of Investigation began investigating Ghent. (Factual Proffer ¶ 37.) West Palm Beach Police Department Sergeant Patrick Flannery's February 20, 2007 report makes the following findings: (1) in either 2000 or 2001, Ghent visited the "Relax With Us" massage parlor and, "at a later date," Ghent returned to the massage parlor and was given a "session" that consisted of "manual stimulation"; (2) in mid-2003, Bernadette Lesueur, an owner of the "Relax With Us" massage parlor "began to give Officer Ghent weekly payments" because Ghent "was her friend and she 'felt sorry for him,'" and these "payments continued for four (4) to five (5) weeks"; (3) in late 2005, Ghent "approached [Bernadette Lesueur] as she gathered the weekly payroll," and asked her "Where's my cut?"; (4) "sometime after April 25, 2005," "[o]n a videotape of the interior of the [Relax With Us massage parlor], Officer Michael Ghent can be seen accepting a large sum of money from Jean Marie Lesueur, Bernadette Lesueur's husband," Jean Lesueur told Sergeant Flannery that "he and his wife had agreed to provide Officer Michael Ghent with $5,000.00 to

purchase a home and an additional $4,000.00 to purchase Iraqi Dinar," and the videotape depicts Jean Lesueur giving Ghent the $9,000.00 in cash; (4) Luis Sierra, Bernadette Lesueur's son-in-law, stated that "he had purchased illegal drugs for Officer Michael Ghent . . . at Officer Michael Ghent's request . . . on four (4) or five (5) occasions" and that he "was also present on approximately five (5) occasions when his mother-in-law gave Officer Michael Ghent money"[11]; (5) on November 4, 2005, Ghent signed a document entitled Florida Housing Finance Corporation Tenant Income Certification, on which he falsely claimed that he earned only $29,500.12 per year; (6) at some point between November 2004 and November 2006, Ghent used cocaine in the presence of an employee of "Relax With Us" and asked that employee if she wanted to use cocaine with him; and (7) on at least thirteen separate occasions Ghent purchased prostitution services, which occurred with a minimum of three different women.[12]  (See Flannery Report, Case No. 08-cv-81283, D.E. 183, at 45-61.)  The Factual Proffer sets forth the following additional findings from the WPBPD and FBI investigations: (1) in February 2005, Ghent received a check for $12,500 from the owners of "Relax with Us" (Factual Proffer ¶ 29 (citing Ghent Deposition, Case No. 08-cv-82283, D.E. 280-3 at 257-59; Probable Cause Affidavit, Case No. 08-cv-82283, D.E. 112-3,

---

[11]     There is no date provided in the report for the conduct alleged by Luis Sierra.

[12]     Sergeant Flannery reported that Nicole Rodriguez stated that Ghent's first "session" with her occurred in early 2006.  There is no date listed for Ghent's "sessions" with Rebecca Baez; however, the report notes that Baez was employed with "Relax With Us" from November 2004 until November 2006.  There is no date listed for Ghent's "sessions" with Melissa Hale and the report does not state when Hale worked for the massage parlor.

16

at 15-16)); (2) in October and November 2005, Ghent signed state housing forms, falsely claiming that he was employed by "Relax With Us" in order to obtain subsidized housing (Id. ¶¶ 30-31 (citing Probable Cause Affidavit, Case No. 08-cv-82283, D.E. 112-3, at 6-7; Rental Application, Case No. 08-cv-82283, D.E. 280-4, at 20-26)); (3) from 2005 through 2006, Ghent paid an employee of "Relax With Us" to masturbate him and asked her to engage in oral and vaginal sex for money but she refused (Id. ¶ 32 (citing Police Interview with Rebecca Baez, Case No. 08-cv-81283, D.E. 183-1, at 49-52)); and (4) in January 2006, Ghent used cocaine in the presence of an employee of "Relax With Us" and asked that employee if she wanted to use cocaine with him (Id. (citing Police Interview with Rebecca Baez, Case No. 08-cv-81283, D.E. 183-1, at 54-56)).

On February 22, 2007, Ghent was arrested on charges of bribery, perjury by false written declaration,[13] and solicitation of prostitution. (Factual Proffer ¶ 39.) On April 10, 2007, Ghent entered into a deferred prosecution agreement[14] with the Palm Beach County State Attorney's Office (Case No. 08-cv-81283, D.E. 112-2), which, upon completion of the requirements of his deferred prosecution agreement, "no-filed" the charges against Ghent on September 9, 2008 (Case No. 08-cv-81283, D.E. 112-4). The West Palm Beach Police Department's internal investigation of Ghent in 2007 found that allegations against Ghent

---

[13]     The Parties have stated that the perjury charge was based on Ghent's false claims regarding the residential rental applications. The Parties have not provided the Court with the information filed against Ghent in the state criminal case.

[14]     In the deferred prosecution agreement, Ghent never admits guilt for the charges. (See Case No. 08-cv-81283, D.E. 112-2.)

of "Conduct Unbecoming," "Criminal Conduct," and "Failure to Follow Orders" were all "substantiated." (Case No. 08-cv-81283, D.E. 112-5.) On March 15, 2007, Ghent resigned from the West Palm Beach Police Department. (Id.)

The Parties have not explained to the Court how the Government's failure to disclose any of Ghent's post-trial criminal activities constitutes a Brady violation. "The Brady rule is grounded in a defendant's right to a fair trial," as "Brady concerned the suppression of evidence prior to and during trial that was material to the proceedings and denied the defendant a fair trial." Grayson v. King, 460 F.3d 1328, 1337 (11th Cir. 2006) (emphasis added). "'[U]nless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside . . . . [T]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Id. (quoting United States v. Bagley, 473 U.S. 667, 675-76 (1985)) (citing Kyles, 514 U.S. at 434; United States v. Agurs, 427 U.S. 97, 108 (1976)). Accordingly, "it is the suppression of evidence before and during trial that carries Brady's constitutional implications." Id. (emphasis added). Furthermore, the Eleventh Circuit has stated that "Brady v. Maryland has no application in the postconviction context." Cunningham v. Dist. Attorney's Office for Escambia Cnty., 592 F.3d 1237, 1260 (11th Cir. 2010) (citing Dist. Attorney's Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 69, 129 S. Ct. 2308, 2319-20 (2009)); see also Galatolo v. United States, 394 F. App'x 670, 672-73 (11th Cir. 2010) (unpublished).

Here, the Government has repeatedly stated that it was unaware of the allegations of

18

Ghent's criminal conduct until 2007, over four years after Phillips' trial in 2002. (See Joint Memorandum 1, 10, 11, 15, 17, 25-26, 28.)  The Parties have failed to explain to the Court how third party allegations of Ghent's criminal conduct following Phillips' trial, as well as his entry into the deferred prosecution agreement with the Palm Beach County State Attorney's Office in 2007, could be imputed to the prosecution at the time of Phillips' trial in 2002.  Furthermore, the Parties have failed to explain how Ghent's conduct following the trial would be material under Brady.

The allegations of Ghent's criminal conduct following Phillips' trial are similar to those against police officers as set forth in an unpublished Eleventh Circuit opinion, United States v. Thompson, 335 F. App'x 876 (11th Cir. 2009) (per curiam).  The case against the defendant, Corry Thompson, "was based on evidence discovered by the Atlanta Police narcotics unit in a house on Palmetto Street that was searched in October 2003 and an apartment on Oglethorpe Avenue that was searched in October 2002." Id. at 877-78. "Each search, undertaken after a confidential informant purchased drugs at that location, turned up hundreds of grams of cocaine, along with crack cocaine, ecstasy, and guns." Id. at 878. Thompson went to trial in April 2005 and was convicted by a jury on narcotics and firearms charges. Id. The Eleventh Circuit affirmed his convictions on December 27, 2006. See United States v. Thompson, 473 F.3d 1137, 1144 (11th Cir. 2006). "In April 2007, two members of the narcotics unit of the Atlanta police department pleaded guilty to federal civil rights violations after they killed an elderly woman in her (drug-free) home in November 2006," and "[o]ne of the officers who pleaded guilty to a role in the November 2006 shooting

was Officer Junnier, who had also led the team that investigated and searched the Oglethorpe Avenue address in October 2002." Thompson, 335 F. App'x at 878-79. "[T]he officer who [got the] warrant [to search the Oglethorpe Avenue address] has . . . pleaded guilty to conspiring to violate civil rights based on a warrantless search that occurred in October 2005." Id. at 879. Based on these events, Thompson filed a motion for new trial, which the district court denied on multiple grounds. Id. The Eleventh Circuit summarized the district courts findings as follows:

> In short, because Officer Junnier's misconduct occurred years after the search in this case, the district court found that the newly discovered evidence was merely impeaching and that it would be inadmissible anyway under Rule 404(b). Moreover, Junnier's testimony had been corroborated by other officers and by a smorgasbord of physical evidence, meaning that Thompson could not show that a new trial would probably produce a different result.

Id. On appeal, the Eleventh Circuit found that there was no Brady violation when "Officer Junnier and Sergeant Stallings' convictions were based on events that occurred in late 2005 and late 2006 – three to four years after the Oglethorpe Avenue search and six to eighteen months after Thompson's trial. In other words, there is no evidence that the Atlanta narcotics officers committed any misconduct until more than three years after the Oglethorpe Avenue search." Id. at 881. The Eleventh Circuit concluded that "Thompson would not be entitled to a new trial so that he may impeach a witness based on that person's actions that occurred after his original trial." Id. (emphasis in original).

Accordingly, at this stage in the proceedings, because the Parties have failed to show how third party, post-trial allegations of Ghent's criminal conduct occurring after Phillips'

trial would be material evidence under Brady, or how these allegations can be imputed to the Government, the Court finds that Phillips has failed to show "a likelihood of success on the merits" on this Brady claim.  Gomez, 899 F.2d at 1125 (citing  Calley, 496 F.2d at 702).

## II.  Alleged Giglio Violation

In Giglio v. United States, the Supreme Court held that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with" due process.  405 U.S. 150, 153 (1972).  "Giglio error, a species of Brady error, occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." Ford v. Hall, 546 F.3d 1326, 1331 (11th Cir. 2008) (internal citations and quotation marks omitted); see also Hammond v. Hall, 586 F.3d 1289, 1306-07 (11th Cir. 2009) (stating that "[a] Giglio claim involves an aggravated type of Brady violation in which the suppression of evidence enabled the prosecutor to put before the jury what he knew was false or misleading testimony or allowed the prosecutor himself to make a false statement to the jury" (citations omitted)). To establish a Giglio claim, Phillips must prove: "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could . . . have affected the judgment." Ford, 546 F.3d at 1332 (quoting Davis v. Terry, 465 F.3d 1249, 1253 (11th Cir. 2006)).  "For Giglio violations, the defendant is entitled to a new trial 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  Guzman v. Sec'y, Dep't of Corr., 663 F.3d 1336, 1348 (11th Cir.

21

2011) (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976)).  "'The could have standard requires a new trial unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt.'"  <u>Id.</u> (quoting <u>Smith v. Sec'y, Dep't of Corr.</u>, 572 F.3d 1327, 1333-34 (11th Cir. 2009)).

The Factual Proffer contains allegations that Ghent testified falsely at trial about the events of April 6, 2001.  At trial, Ghent testified that on April 6, 2001, he and Chappelle, a CI, went to 625 8th Street to make a controlled buy of crack cocaine.  (Case No. 08-81283, D.E. 68-39, Trial Transcript at 6.)  Ghent further testified that upon arriving at the 625 8th Street, Chappelle saw "86" (Phillips) "across the street."  (<u>Id.</u> at 11.)  Ghent stated that Chappelle approached Phillips, "asked him for a 50 pack of crack cocaine," at which point Phillips went into 625 8th Street, retrieved bags filled with white substances that later tested positive for crack cocaine, and gave them to Chappelle in exchange for the $50 that Ghent had previously provided to Chappelle.  (<u>Id.</u> at 11-14.)  The jury convicted Phillips of distribution of crack cocaine occurring on April 6, 2001 (Count 9).

In their Joint Memorandum, the Parties allege that Ghent testified falsely at trial about the time he arrived at 625 8th Street on April 6, 2001 and the events that prompted his investigation.  (<u>See</u> Joint Memorandum 17-19.)  In particular, the Parties allege that Ghent testified that he arrived at 625 8th Street on April 6, 2001 when "[i]t was just getting dark," at "9:30," but evidence revealed after trial showed that the sun set at 7:40 p.m. on April 6, 2001 and that Ghent likely did not leave a class that evening before 8:30 p.m.  (<u>Id.</u> at 18.)  However, as the Parties recognize, this inconsistency in the time Ghent arrived at 625 8th

Street was presented to the jury.  On direct examination, the questioning regarding the time

Ghent arrived at 625 8th Street was as follows:

> Q.    Approximately what time of day was it when you and the confidential
>        informant arrived at the residence?
> A.    It was just getting dark.
> Q.    Do you know approximately what time it was?
> A.    9:30.

(Case No. 08-81283, D.E. 68-39, Trial Transcript at 10.)  The Parties also allege that Ghent

claimed at trial that his investigation was prompted by "citizen complaints," but that he later

admitted that Phillips "was always the specific target of the investigation."   (Joint

Memorandum 18-19.)  However, at the trial, during direct examination, Ghent stated that he

had "received numerous citizen complaints and complaints from officers that a large amount

of narcotics were coming out of apartment two."  (Case No. 08-81283, D.E. 68-39, Trial

Transcript at 5.)  Defense counsel also cross-examined Ghent on this issue, and Ghent stated

that his investigation began with "a citizen's complaint, an officer's complaint":

> Q.    Yours was a different investigation than the one everybody else was
>        doing?
> A.    Mine started as a citizen complaint on 625 8th Street that Elroy Phillips
>        happened to allegedly own.
> Q.    Your investigation started in January, right?
> A.    Correct.
> Q.    You said you had been surveilling Mr. Phillips since January, right?
> A.    Yes.
> Q.    So as of January, you were targeting Mr. Phillips, right?
> A.    Yes.
> Q.    So this did not just start out of the blue with you, right?
> A.    Started through a citizen's complaint, an officer's complaint.
> Q.    Officer's complaint.  An officers is a citizen, right?
> A.    When they are off duty I guess.
> Q.    Were you or were you not part of the same investigation that was being

23

         done by Agent Enockson and all these other people?  Agent Kapper,
         Agent Emmons, all these other people?

A.     I don't know the details of everybody else's investigation.  I just know
         my part in the investigation.

(Id. at 33-34.)  Accordingly, the jury was made aware of the inconsistency in Ghent's testimony regarding the events that prompted his investigation.

Although the Parties claim that the inconsistencies regarding the time Ghent arrived at 625 8th Street and the events that prompted his investigation, coupled with allegations of Ghent's criminal conduct,[15] show that he committed "perjury," thereby causing a Giglio violation (see Joint Memorandum 17-19), the Parties have not presented any case law that demonstrates these inconsistencies in Ghent's trial testimony are sufficient to show that the Government knowingly solicited false testimony or that such use was material.  See Ford, 546 F.3d at 1331.  As set forth above, the jury was made aware of the inconsistencies in Ghent's testimony through direct and cross examination, and the Parties have failed to explain how further elaboration on these inconsistencies could have affected the judgment of the jury.  See, e.g., Tejada v. Duggar, 941 F.2d 1551, 1557 (11th Cir. 1991) (stating that "at trial Tejada's counsel brought out on cross-examination the inconsistency between Ortiz's testimony and his earlier sworn statement" and that "because the jury was made aware of the inconsistency, the 'false' testimony could not affect the judgment of the jury"); United States v. Pettway, 364 F. App'x 540, 542 (11th Cir. 2010) (per curiam) (stating that "[o]ther than

---

[15]    As stated above, the Parties have not explained to the Court how allegations of Ghent's alleged drug use and drug distribution would have been admissible at Phillips' trial.  See supra Part I.A.

24

the discrepancy in the witness's testimony, Pettway presented no evidence that the government knowingly solicited false testimony").

In addition to the inconsistencies in Ghent's trial testimony, the Parties also assert that Chappelle and Phillips will testify at an evidentiary hearing that the April 6, 2001 buy never happened.  (See Joint Memorandum 20.)  In interviews in 2010 and 2012, Chappelle has denied being a CI or being involved in Phillips' case (see Factual Proffer ¶¶ 50, 54); however, WPBPD records from 2001 indicate that she was involved in this case.  For example, the record contains an Investigative Funds Expenditure Report authorizing the payment of $50 to Chappelle, which is dated April 6, 2001, and which bears her signature, as well as the signatures of Ghent and Captain Kevin Coppin of the WPBPD.  (Case No. 08-81283, D.E. 191-1, IFE Report attached to Coppin Declaration, at CM/ECF p. 10.)  The record also indicates that the following officers were members of the same team as Ghent and accompanied Ghent and Chappelle an area near 625 8th Street on April 6, 2001: Lieutenant Brian Kapper[16] and Sergeant Bradley Emmons[17] of the West Palm Beach Police Department.[18]  In a 2010 declaration, Kapper stated that he reviewed Ghent's police report

---

[16]     Ghent testified at trial that "[o]ther members of the West Palm Beach Police Department in the apprehension team assisted [him]" during the controlled purchase on April 6, 2001.  (See Case No. 08-cv-81283, D.E. 68-39, Trial Transcript, at 6.)  A review of Kapper's testimony at trial also indicates that Kapper may have accompanied Ghent to 625 8th Street on April 6, 2001.  (See Case No. 08-cv-81283, D.E. 68-42, Trial Transcript, 72-74.)

[17]     Emmons testified at trial, but he was not questioned about the events of April 6, 2001.

[18]     Agent Larry Castelli and Lieutenant William Amason of the West Palm Beach Police Department also were members of this team, but there is no indication from the record

on the April 6, 2001 controlled buy and "recall[ed] that team member Agent Emmons and
I assisted Ghent in that operation." (Case No. 08-81283, D.E. 191-8, Kapper Declaration ¶
3.) Kapper further stated that "at approximately 9:30 p.m. on April 6, 2001, Emmons, Ghent,
and I met an informant known to me as Gnita Chappelle, a.k.a. G-Money, in a parking lot of
a closed building in the north end of the city." (Id. ¶ 6.) After searching Chappelle and her
vehicle for contraband, currency, and narcotics, "Chappelle was then given investigative
funds to purchase narcotics at 625 8th Street" and Ghent and Chappelle got into Chappelle's
car and drove to 625 8th Street, "which was less than two miles away." (Id. ¶¶ 7, 8.) Kapper
explained that he and Emmons "stayed clear of the immediate area of 625 8th Street so as not
to arose the suspicions of anyone at that location." (Id. ¶ 8.) Kapper stated that "Ghent wore
a transmitter so that I could use a Unitel device to monitor the operation," and that "Emmons
and I had the Unitel device in our unmarked police vehicle and parked one or two blocks
from 625 8th Street." (Id. ¶¶ 7, 8.) Kapper and Emmons "could not see the actual
transaction." (Id. ¶ 8.) Kapper stated that after the transaction, Ghent and Chappelle
"returned to the same parking lot, and Emmons and I met them there." (Id. ¶ 9.) In the
parking lot, "Ghent identified Elroy Phillips as the person who had sold the crack to
Chappelle," and "Chappelle was paid for her assistance, signed the WPBPD Investigative

---

that they accompanied Ghent and the CI to 625 8th Street on April 6, 2001. Castelli, Amason,
and Coppin did not testify at trial. The record indicates that Captain Coppin did not accompany
Ghent and Chappelle to 625 8th Street on April 6, 2001 because he was on vacation leave from
April 3 through April 10, 2001. (See Case No. 08-81283, D.E. 191-1, Coppin Declaration ¶¶ 3,
7.) However, Coppin did "review and sign the April 6, 2001 IFE report authorizing the payment
of $50 to Chappelle, which bears her signature." (Id. ¶ 7.)

Funds Expenditure Report, and left the area." (Id.)  In his 2010 declaration, Emmons

provided a similar narrative of the events of April 6, 2001.  (Case No. 08-81283, D.E. 191-9,

Emmons Declaration ¶¶ 3-7.)  Emmons also stated that "I do not recall what I heard on the

Unitel.  I do recall, however, that it was a run of the mill drug buy and that nothing unusual

occurred."  (Id. ¶ 6.)  There is no indication in the record that these officers have ever

disclaimed their involvement in the events of April 6, 2001 or that these officers have

provided a different version of these events.

Moreover, even assuming that Ghent's testimony at trial was false, the Parties have

not presented to the Court any facts or argument that the prosecutor knew or should have

known that Ghent's testimony at trial was false.  See Ford, 546 F.3d at 1331.  As with the

alleged Brady material, the Parties have not provided the Court with an analysis regarding

whether Ghent's knowledge of his own actions can be imputed upon the prosecution.  See

supra Part I.  Accordingly, at this stage in the proceedings, because the Parties have not

shown that Ghent's testimony was false, that the prosecution knew or should have known

that his testimony was false, or that the use of Ghent's testimony was material, the Court

finds that Phillips has not "demonstrate[d] a likelihood of success on the merits" of this

Giglio claim.  Gomez, 899 F.2d at 1125 (citing Calley, 496 F.2d at 702).

In addition, even assuming that the use of Ghent's testimony was false, that the

prosecutor knew or should have known that his testimony was false, and that the use of his

testimony was material for Count 9, the Parties have not shown that the use of Ghent's

27

testimony was material for the other counts, particularly for Count 1.[19]  In Count 1, Phillips

was convicted of conspiracy to distribute five grams or less of crack cocaine, in violation of

21 U.S.C. § 846.   In affirming Phillips' convictions on all counts, the Eleventh Circuit

summarized the evidence presented at trial, which included extensive testimony from

cooperating co-defendants Ben Black, James Yearby, Stephanie White, Rufus Williams, and

Roscoe Cooper:

> According to Williams's testimony, by early 2000, Dwayne Morley was selling
> drugs from 625 8th Street for Phillips.   Williams testified that Morley
> eventually left Phillips's employ and started selling drugs from a location
> adjacent to 625 8th Street at 7th Street and N. Rosemary Avenue in West Palm
> Beach.   White testified that several individuals sold from early 2000 until
> September 2000, including herself and Yvelle Phillips, the defendant's sister.
> In September or October 2000, Yearby, who formerly worked for Morley,
> became the primary seller at 625 8th Street, working principally with Cooper.
> Yearby testified that in mid-March 2001, he stole Phillips's car and some of
> Phillips's drugs and left for Miami.   Black testified that he began selling drugs
> for Phillips at 625 8th Street in mid-March 2001, working with "a dude named
> Aunte" and "a dude named Unc" at times, and left in early May 2001.

United States v. Phillips, 177 F. App'x 942, 944 (11th Cir. 2006) (footnote omitted).   The

Eleventh Circuit elaborated on the co-defendants' testimony as follows:

> White testified that she lived with Phillips at 1103 35th Street from March to
> December 2000 and occasionally thereafter until her arrest in April 2001.
> According to White, she spent most of her time from March to December 2000
> at 1103 35th Street.   She testified that she saw Phillips with powder cocaine
> in the apartment numerous times and explained how Phillips converted the
> powder cocaine into crack cocaine to sell at 625 8th Street.   White admitted to
> being an active member of a conspiracy run by Phillips to distribute drugs from

---

[19]      The Court sentenced Phillips to a term of imprisonment of 288 months as to
Counts 1 and 9, 24 months as to Count 11, and 180 months as to Count 14 (Count 17 was
merged with Count 14), all to run concurrently.   (Case No. 01-cr-08084, D.E. 403.)

625 8th Street, primarily by packaging the crack cocaine into small baggies, delivering the baggies to the sellers at 625 8th Street once or twice daily, and collecting the proceeds from the drug sales. She also stated that she accompanied Phillips to Miami a few times to purchase amounts of powder cocaine ranging from a few ounces to a half-kilogram and once saw an individual deliver powder cocaine to Phillips at 1103 35th Street. White was arrested on April 11, 2001 and pleaded guilty to two narcotics offenses stemming from a sale to a CI.

Yearby testified that he began to work for Phillips at 625 8th Street in October 2000. Shortly after Phillips hired him, Yearby moved into Apartment 2 at 625 8th Street and lived there until March 2001, sharing the apartment with Cooper for a time; with Phillips's permission, Yearby paid the rent from the drug proceeds. From October 2000 to March 2001, Yearby was the primary seller at 625 8th Street and was responsible for controlling the drugs and drug proceeds and for hiring lookouts to alert him of police in the area. Yearby generally worked everyday from approximately 4:00 p.m. when Phillips arrived with a supply of crack and powder cocaine until 5:00 a.m. Yearby testified that Gene Horn, Phillips, or White would come to 625 8th Street a few times per night with a new supply of drugs. DEA Special Agent Robert Smith testified, and Yearby admitted, that Yearby and Cooper made several large sales of crack cocaine to a CI and him. Yearby was arrested on April 11, 2001 and later pleaded guilty to possession of and conspiracy to distribute five or more grams of crack cocaine.

Williams testified that with Phillips's sister's assistance, he delivered powdered cocaine twice from Miami to Phillips in West Palm Beach. Additionally, he testified that in late 2000 or early 2001 Phillips tried to recruit him to replace Yearby. Williams initially rejected the offer but after a dispute with Morley, Williams started selling crack cocaine for Phillips from Morley's location at 7th Street and N. Rosemary Avenue. This arrangement continued without Morley's knowledge from January to March 2001. On one occasion in January 2001, Yearby did not have enough crack cocaine for a CI; therefore, Yearby and the CI went to see Williams and Williams sold crack cocaine to the CI. Finally, he testified that Phillips's uncle began selling at 625 8th Street after Yearby left. Williams was arrested in May 2001 following his indictment for the sale to the CI and another sale. He pleaded guilty to one count, and the other was dismissed.

Black testified he began working for Phillips at 625 8th Street in mid-March 2001. A "dude named Unc" was the primary seller for the first two weeks

after Black arrived.  Black would get the drugs from Phillips or a "dude named Aunte" would deliver them, and Black would give them to Unc to sell and Black would collect the money from Unc.  Black also noted that he once saw Phillips and Aunte make crack cocaine at 625 8th Street and once witnessed a drug dealer bring a kilogram of powder cocaine to Phillips.  Black pleaded guilty to selling fifty or more grams of crack cocaine and stated that he sold between $3000 and $4000 of powder cocaine and crack cocaine per day five days per week until he left in early May 2001.  Black was arrested on June 16, 2001.

Id. at 944-45 (footnote omitted).  The Eleventh Circuit found that there was sufficient

evidence to convict Phillips of Count 1, stating as follows:

On appeal, Phillips challenges the sufficiency of the evidence to support his conviction for conspiracy to distribute five or less grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and § 846.  Phillips contends that the jury must have convicted him of the conspiracy because it believed that he conspired with the CI in the April 6 transaction, the only sale for which Phillips was convicted.  Phillips supports his reasoning by showing that the jury acquitted him of the indicted offenses that underlaid the conspiracy charge – i.e., the sales by Yearby, White, Cooper, and Black, that the district court failed to instruct the jury that a defendant cannot conspire with a government agent, and that the jury reduced the amount of drugs involved in the conspiracy from fifty grams or more as listed in the indictment to five or less, which corresponds with the amount involved in the April 6 transaction.  According to Phillips, the only way the jury could have convicted him of conspiracy is because it erroneously believed that he conspired with the CI, a government agent, on April 6.  Therefore, he contends that sufficient evidence does not support his conviction.

. . .

Count One charges Phillips: "From at least as early as in or about December, 1999, the exact date being unknown to the Grand Jury, and continuing through on or about June 8, 2001, in West Palm Beach, Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants, Elroy Phillips, a/k/a '86' and '6,' and Ben Black, Jr., did knowingly and intentionally combine, conspire, confederate, and agree with each other and with persons known and unknown to the Grand Jury, to distribute a Schedule II controlled substance, that is fifty (50) or more grams of a mixture and substance

30

containing a detectable amount of cocaine base, commonly known as 'crack cocaine.'" In the special verdict, the jury convicted Phillips of the conspiracy charged but determined that the conspiracy was to distribute five or less grams of crack cocaine.

We note that we doubt whether Phillips preserved his argument that the district court erred by failing to instruct the jury that a defendant cannot conspire with a government agent. Phillips's argument fails, however, for several reasons. First, the conspiracy as alleged by the government was broader than the counts for which the jury acquitted Phillips. As alleged in the indictment, the conspiracy dated back to 1999 and included Black and "persons known and unknown to the Grand Jury." The government presented extensive evidence showing that Phillips conspired with Yearby, Cooper, White, Williams, Morley, Black, and others in obtaining powder cocaine to convert into crack cocaine, manufacturing crack cocaine, and distributing large quantities of crack cocaine over a period of several years. Several of Phillips's co-conspirators testified that they worked for Phillips when they sold large quantities of crack cocaine from 625 8th Street to many individuals, not just the government agents. As the ultimate finder of fact, the jury was free to accept some of the government's evidence and reject other parts of the government's evidence. The extensive evidence the government presented left the jury with many ways to conclude that Phillips conspired to distribute five or less grams of crack cocaine without necessarily concluding that Phillips conspired with the government agent on the April 6 transaction.

Second, we have held on several occasions that each count in an indictment is a separate count and the jury's decision to acquit on one count does not have res judicata effect on any separate count. United States v. Odom, 252 F.3d 1289, 1298 (11th Cir. 2001) (citing Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932)). "Consistency in the verdict is not required." Dunn, 284 U.S. at 393, 52 S.Ct. 189. In United States v. Powell, the Supreme Court reaffirmed Dunn and upheld the defendant's conviction even though the jury acquitted her of possession with the intent to distribute cocaine but convicted her of conspiracy to possess cocaine with intent to distribute. 469 U.S. 57, 60, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). The case for upholding Phillips's conviction is at least as compelling as it was in Powell because, as noted, the government presented extensive evidence of a conspiracy that went beyond the predicate offenses for which the jury acquitted Phillips. Because we conclude a reasonable trier of fact could have found Phillips guilty beyond a reasonable doubt, we affirm his conspiracy conviction.

Id. at 951-53.

In cases where multiple witnesses testify regarding the same acts, the impeachment of any single witness is less likely to meet the materiality prong.  See United States v. Noriega, 117 F.3d 1206, 1219 (11th Cir. 1997) (stating that "[b]ecause the evidence at issue only would have facilitated further impeachment of one witness (out of more than forty called by the government) who gave testimony corroborative in nature related to one area of the case, . . . the government's suppression of its deal with Santacruz–Echeverri fails to satisfy Kyles's second prong");[20] but see Espinosa-Hernandez, 918 F.2d at 914 (finding that the testimony of three witness "appear to have inflicted the greatest damage to Espinosa's defense," but remanding the matter to the district court for an evidentiary hearing because "this testimony was hotly contested at trial" and the testimony from a Customs Service Agent "may have tarnished Espinosa's credibility in the eyes of the jury enough that the jury disbelieved his claims of innocence and instead believed the testimony of [the other three witnesses]").  As outlined above, in addition to Ghent's testimony about the April 6, 2001 controlled purchase of crack cocaine from Phillips, five of Phillips' cooperating co-defendants provided extensive testimony about selling cocaine for Phillips at 625 8th Street

---

[20]    The Eleventh Circuit in Noriega cited Carter v. Johnson, 110 F.3d 1098, 1105 (5th Cir. 1997) (rejecting Kyles claim premised upon suppressed impeachment evidence related to one witness because "[t]he prosecution did not rely upon [that witness]'s testimony to establish the essential elements of the offense, but merely to corroborate the [defendant's] confession") and United States v. Amiel, 95 F.3d 135, 146 (2d Cir. 1996) ("Moreover, independent evidence tied each defendant to the criminal conduct, such that cumulative impeachment evidence against [two witnesses] does not undermine our confidence in the outcome of the trial.").  Noriega, 117 F.3d at 1219.

in 2000 and 2001.  See Phillips, 177 F. App'x at 944-45.  The Eleventh Circuit found that "the government presented extensive evidence showing that Phillips conspired with Yearby, Cooper, White, Williams, Morley, Black, and others in obtaining powder cocaine to convert into crack cocaine, manufacturing crack cocaine, and distributing large quantities of crack cocaine over a period of several years.  Several of Phillips's co-conspirators testified that they worked for Phillips when they sold large quantities of crack cocaine from 625 8th Street to many individuals, not just the government agents. "  Id. at 952.  Furthermore, the Eleventh Circuit specifically noted that "[t]he extensive evidence the government presented left the jury with many ways to conclude that Phillips conspired to distribute five or less grams of crack cocaine without necessarily concluding that Phillips conspired with the government agent on the April 6 transaction."  Id.  Accordingly, at this stage in the litigation, based on the extensive testimony by the cooperating co-defendants as outlined by the Eleventh Circuit, the Court finds that Phillips has not "demonstrated a likelihood of success of the merits" of his Giglio claim as he has not shown that the use of Ghent's testimony was material to his conviction on Count 1, and he is thus not entitled to release pending the Court's ruling on the Joint Motion to Vacate.  Gomez, 899 F.2d at 1125 (citing Calley, 496 F.2d at 702).  The Court further finds that Phillips has not demonstrated that there are "extraordinary and exceptional circumstances . . . which make the grant of bail necessary to preserve the effectiveness of the habeas relief sought" because even if the Court vacates Phillips' conviction on Count 9, he would remain incarcerated on Count 1.  See id. (citing Calley, 496 F.2d at 702).

33

III.   **Mesarosh v. United States**

"Under the reasoning set forth in <u>Mesarosh v. United States</u>, [352 U.S. 1 (1956)], the U.S. Attorney's Office further asks the Court to vacate the convictions on Counts 1, 9, 14, and 17."  (Joint Memorandum 27.)   In considering a case where a government witness testified at trial that he had given differing accounts regarding the whereabouts of the cocaine he supposedly purchased from the defendant, the Eleventh Circuit described <u>Mesarosh</u> as follows:

> In <u>Mesarosh</u> after the defendants were convicted of violations of the Smith Act and while their case was awaiting Supreme Court review, the Solicitor General discovered that one government witness had later given wholly contradictory testimony before a legislative committee.  In ordering a new trial, the Court held that since the witness gave reality to the charges against the defendants no court could conclude that his testimony was insignificant and that the testimony tainted the trial as to all petitioners. 352 U.S. at 10.  The Court then referred to its decision in <u>Communist Party [of the United States v. Subversive Activities Control Board</u>, 351 U.S. 115 (1956)], in which three professional informers who provided the material evidence against the defendants were subsequently put under investigation for perjury.  The Court held there that if a witness's testimony in proceedings on substantially similar subject matter is perjured it does not "remove the taint for a reviewing court to find that there is ample innocent testimony to support the Board's findings." 351 U.S. at 124.  In <u>Mesarosh</u>, the Court concluded by stating that only a jury could determine what it would have done with a different body of evidence and that since the jury could no longer act in the case a new trial was required. 352 U.S. at 12.

<u>United States v. Brunoehler</u>, 714 F.2d 99, 101 (11th Cir. 1983).  In <u>Brunoehler</u>, the Government's witness was a paid confidential informant who testified at trial that "he had given differing accounts regarding the whereabouts of the cocaine." <u>Id.</u> at 100.  The Eleventh Circuit distinguished <u>Mesarosh</u> and <u>Communist Party</u> from the circumstances in that case, stating as follows:

34

Both <u>Mesarosh</u> and <u>Communist Party</u> can be distinguished from the present case. In both cases, the government discovered the perjury of its witnesses after trial. Neither the jury, in <u>Mesarosh</u>, nor the Control Board, in <u>Communist Party</u>, had the opportunity to assess the unreliability of or to disregard the witness's testimony. By contrast, in the present case the jury was fully apprised of Wyman's prior misstatements and of its right to disregard his testimony. The <u>Mesarosh</u> requirement that "the issue of the truthfulness of the witness be presented fully to the jury," <u>United States v. Davis</u>, 473 F.2d 1023, 1025 (10th Cir. 1973), appears to have been met.

. . .

<u>Mesarosh</u> and its progeny are inapposite to the appellant's argument for still another reason. <u>Mesarosh</u> has been interpreted to apply only to those cases in which the credibility of a government witness has been discredited by the witness's commission of <u>perjury</u> in other similar cases. <u>United States v. Krasny</u>, 607 F.2d 840, 845 (9th Cir. 1979).

<u>Id.</u> at 101-02 (emphasis in original). As stated above, although the Parties allege that Ghent perjured himself at trial (<u>see</u> Joint Memorandum 17-19), the Parties have not set forth an adequate analysis supporting their assertions of Ghent's perjury in Phillips' trial or in "other similar cases," <u>Brunoehler</u>, 714 F.2d at 102. To the extent that the Parties claim that their assertions of Ghent's perjury are supported by the inconsistencies in Ghent's trial testimony, those inconsistencies in his testimony regarding the time and the events proceeding the investigation were explored on direct and cross examination and thus presented to the jury. <u>See</u> <u>supra</u> Part II. To the extent that the Parties claim that their assertions fo Ghent's perjury are supported by the claims of Chappelle and Phillips that the April 6, 2001 control buy never occurred, there is other evidence in the record aside from Ghent's testimony that indicates that the April 6, 2001 controlled buy did occur. <u>See</u> <u>supra</u> Part II (discussing the declarations of WPBPD Officers Kapper, Emmons, and Coppin as well as the Investigative Funds

35

Expenditure Report authorizing the payment of $50 to Chappelle, which is dated April 6, 2001, and which bears her signature).

Finally, the <u>Brunoehler</u> Court noted that the prosecutor's belief that a government witness was not credible is not dispositive of the issue:

> In describing the credibility of his witness, the prosecutor pointed out these differing accounts while at the same time explaining why Wyman might have lied earlier.  The belief of the prosecutor as to Wyman's credibility or lack of it is not determinative.  In <u>United States v. Mathis</u>, 668 F.2d 1157 (10th Cir. 1982), even a prosecutor's subsequent belief that a witness committed perjury was not found to warrant a new trial where the issue of the truthfulness of the witnesses was fully presented to the jury and no evidence surfaced that perjury had been committed.  <u>Id.</u> at 1160.

714 F.2d at 102.  Accordingly, although the U.S. Attorney's Office now believes that Ghent presented false testimony at trial, this belief is not determinative, and the Court finds it may be necessary to hold an evidentiary hearing on the issue.

**IV.   Conclusion**

Based on the facts and arguments presented in the Joint Memorandum and Factual Proffer, at this stage in the proceedings, the Court finds that Phillips has not "demonstrate[d] a likelihood of success on the merits of a substantial constitutional claim," nor has he demonstrated that there are "extraordinary and exceptional circumstances . . . which make the grant of bail necessary to preserve the effectiveness of the habeas relief sought."  <u>Gomez</u>, 899 F.2d at 1125 (citing <u>Calley</u>, 496 F.2d at 702).  Therefore, the Court finds that Phillips is not entitled to release pending the Court's ruling on the Joint Motion to Vacate.

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.    Movant Elroy Phillips' Motions for Release of Movant on His Own Recognizance (D.E. 267, 292) are **DENIED**.

2.    Movant Elroy Phillips' Motion for Status Conference (D.E. 303) is **GRANTED**.  The Court will set the status conference by separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida this 19th day of September, 2012.

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**